**Jerry K. THOMPSON, Appellant (Defendant below),**

v.

**STATE of Indiana, Appellee (Plaintiff below).**

No. 49S00–9507–DP–869.

Supreme Court of Indiana.

Dec. 23, 1997.

Joseph M. Cleary, Robert V. Clutter, Indianapolis, for Appellant.

Jeffrey A. Modisett, Attorney General, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, for Appellee.

BOEHM, Justice.

Jerry K. Thompson was convicted of two counts of murder,[1] two counts of robbery,[2] and one count of carrying a handgun without a license.[3] The trial court sentenced Thompson to death for the murders and imposed a term of years for the other convictions. To

---

1. IND.CODE § 35–42–1–1(1) (Supp.1989). The jury also returned convictions for two counts of felony murder, IND CODE § 35–42–1–1(2) (Supp. 1989), which were merged into the murder convictions.

2. IND.CODE § 35–42–5–1 (1988).

3. IND.CODE § 35–47–2–23(c) (1988).

prove that Thompson was the perpetrator, the State presented evidence that he stole the murder weapon, a handgun, in the course of committing a different murder a month earlier. Although this testimony was admitted only to show that the gun had been in Thompson's possession before the crimes in this case, the State was allowed to elicit significant details of the prior murder and to establish that Thompson was convicted for it. Because we conclude that the extensive evidence of the prior crime was inadmissible under Indiana Evidence Rules 402, 403, and 404(b), and denied Thompson a fair trial, we reverse the convictions and remand for a new trial.

### Factual and Procedural History

On March 14, 1991, Melvin Hillis and Robert Beeler were shot to death at Hillis Auto Sales in Indianapolis. In June 1991, defendant Jerry Thompson and Douglas Percy were driving through Illinois and were stopped for a traffic violation. Illinois state police recovered a nine-millimeter handgun from the vehicle that ballistics tests later determined was the weapon used to kill Hillis and Beeler. In March 1992, Percy approached Indianapolis police with what he claimed was information about Thompson's involvement in the killings. A few months earlier, Percy had been charged with altering a vehicle identification number, a felony. That charge was eventually dismissed in exchange for Percy's testifying about the deaths of Hillis and Beeler. According to Percy, on the day of the killings, he and Thompson went to Hillis Auto Sales where, without any forewarning, Thompson shot both victims and Thompson and Percy robbed them. Percy was the only witness conclusively placing Thompson at the scene. Thompson was charged and a jury convicted

him on all counts. He appeals. This Court has jurisdiction under Indiana Appellate Rule 4(A)(7).

### I. Reading of Death Penalty Information in Voir Dire

■ We first take up an issue not raised by the parties. The trial court began the voir dire, before any questioning had occurred, by reading both the charging information and the death penalty information to all prospective jurors. Specifically, prospective jurors were informed, verbatim, of the four aggravating circumstances the State had pleaded against Thompson in the death penalty information. This occurred with the apparent assent of all counsel. One of the aggravating circumstances was Thompson's prior conviction of the murder of Wesley Crandall Jr., discussed in more detail below.[4] Although it was proper to inform prospective jurors of the crimes charged, the trial court erred in advising the jury of the death penalty information before the sentencing phase. There is enormous potential for prejudice in the guilt phase if the jury is permitted to know from the outset, in a murder case, that the defendant is a convicted killer. For this reason, it has long been established that prospective jurors are not to know of prior convictions until the penalty phase. *Brewer v. State*, 275 Ind. 338, 367–68, 417 N.E.2d 889, 905–06 (1981); *Evans v. State*, 563 N.E.2d 1251, 1259 (Ind.1990) (citing *Brewer*).

■ *Brewer* noted that, as in habitual offender proceedings, the death penalty information must be pleaded on a separate page from the charging instrument to "shield [the defendant] from the hazard of having the knowledge of his prior criminal record prematurely imparted to the jury."[5] *Brew-*

4. Prospective jurors were told the following: "Jerry K. Thompson has been convicted of another Murder; that is, a judgment of conviction for the murder of Wesley A. Crandall, Junior, was entered against Jerry K. Thompson on the 15th day of June, 1993, in Henry County, Indiana, in cause # *33D019207CF027* . . . ." The three other aggravating circumstances were: (1) two counts of committing an intentional killing while committing or attempting to commit a robbery, IND.CODE § 35–50–2–9(b)(1) (Supp. 1990); and (2) one count of committing another

murder at any time, IND.CODE § 35–50–2–9(b)(8) (Supp.1990).

5. Not every aggravator needs to be kept from the jury. *Brewer* distinguished between aggravating circumstances that are extraneous to the crime currently charged, such as a prior murder conviction, and an aggravating circumstance whose proof turns on the same evidence presented at the guilt phase. As *Brewer* put it, in the latter situation "[t]he killing and the robbery were the same *res.*" *Brewer*, 275 Ind. at 368, 417 N.E.2d

*er*, 275 Ind. at 367, 417 N.E.2d at 906. *Brewer* also established that the jury is impermissibly tainted "when the aggravating circumstance to be charged is either a prior murder conviction, a prior murder unrelated to the current offense, or a prior life sentence." *Id.* at 368, 417 N.E.2d at 906. And, as *Evans* put it, if the aggravating circumstances are "prior unrelated crimes . . . it is necessary that the information of prior crimes be withheld from the jury until the instant case is decided." *Evans*, 563 N.E.2d at 1259. Thus it was error to inform jurors of Thompson's conviction of Crandall's murder prior to the penalty phase. *Cf. Leonard v. United States*, 378 U.S. 544, 84 S.Ct. 1696, 12 L.Ed.2d 1028 (1964) (per curiam) (conviction reversed because five jurors had been present when the defendant's conviction of a similar charge was announced in open court before the trial); *Scott v. Lawrence*, 36 F.3d 871 (9th Cir.1994) (in action against prison officials under 42 U.S.C. § 1983, trial court committed reversible error by informing jury sua sponte during voir dire of inmate's prior convictions for rape and sexual assault). We need not address whether this error is a ground for reversal in the absence of any objection by the defense because the convictions must be set aside for the reasons explained in Parts II and III. The issue is raised sua sponte to emphasize what *Brewer* and *Evans* made clear as to how prospective jurors should be instructed on aggravating circumstances in capital cases.

## II. Evidence of Prior Uncharged Misconduct

On February 14, 1991, one month before the murders in this case, Wesley Crandall Jr. was shot to death in his home in New Castle, Indiana. In brief, Percy testified that he and Thompson went to Crandall's house that day to purchase marijuana and that Thompson assaulted and shot Crandall.[6] Thompson then stole several of Crandall's guns, one of which Percy identified at trial as the same handgun recovered in the car search in Illinois in June 1991, and ballistics tests confirmed to be the weapon used to kill Hillis and Beeler. Percy's testimony about the Crandall murder was thus introduced to prove an important element of the State's case—that Thompson had access to the murder weapon before the killings at Hillis Auto Sales.

Indiana Evidence Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . ." Citing Evidence Rules 402 (relevance) and 403 (balance of probative value and prejudice), Thompson argues that the State elicited far more evidence about Crandall's death than was necessary to prove this aspect of its case. He contends that a drumbeat of prejudicial and irrelevant evidence related to Crandall's killing induced the jury to draw the "forbidden inference," at the core of Rule 404(b), that Thompson killed once, so must have done so again. The State responds that a portrayal of the Crandall murder was not prohibited by Rule 404(b) because it helped prove Thompson's identity as the killer. The State also claims that any prejudice to Thompson was offset by a limiting instruction to the jury to constrain its consideration of prior acts to the issue of identity. Ultimately this case turns on whether the jury's exposure to the Crandall incident exceeded permissible bounds. We first examine what went on in the trial court.

at 906. If so, the jury necessarily learns of the aggravating circumstance in the course of the guilt phase. Here, one of the aggravating circumstances charged in addition to the prior murder was that Thompson intentionally killed Hillis and Beeler while committing or attempting to commit a robbery. IND.CODE § 35–50–2–9(b)(1) (Supp.1990). As *Brewer* held, there was no reversible error in informing the jury of that aggravator before the sentencing phase, even if reading any of the charged aggravators is neither necessary nor a desirable practice in capital cases.

6. Before the trial in this case, Thompson was tried and convicted in Henry County of murdering Crandall. That conviction was affirmed on direct appeal. *Thompson v. State*, 671 N.E.2d 1165 (Ind.1996). Thompson is currently serving a ninety-year sentence for that crime.

## A. Pretrial developments

The admissibility of the Crandall murder evidence was contested from the outset. Thompson filed a motion in limine before trial objecting to the admission of any evidence related to Crandall's death, including the fact of Thompson's conviction for that murder. The State indicated its intent to offer evidence related to the Crandall murder to establish Thompson's identity, and that it might offer evidence of Thompson's previous felony convictions "possibly as rebuttal to any attacks on the credibility of witness Douglas Percy ... in the event that any such attack may open the door to the use of such evidence." In a second motion in limine, Thompson responded that this evidence was not admissible under the identity exception because the Indianapolis killings and the Crandall murder were not "signature" crimes.

However, Thompson conceded in his second motion that the State was "entitled to show that Thompson had access to or control over the weapon used to commit the murders of Hillis and Beeler." He claimed this was sufficiently proved by the undisputed evidence that the murder weapon was found when Percy and Thompson were stopped by Illinois state police three months after Hillis and Beeler were killed. The trial court denied Thompson's motion, ruling that the State could show "how a weapon of the crime was obtained. I don't think a signature, in quotes, is a required. I don't think [Rule] 404 precludes the obtaining of the weapon, so the State will be allowed to introduce evidence of the obtaining of the weapon." In sum, the parties and the court concluded before trial that Thompson's access to the murder weapon was relevant to proving that he was the killer. The issue is whether evidence beyond that appropriate to establish access to the gun was admitted and, if so, whether it was harmless error.

## B. Opening arguments

The State emphasized the details of Crandall's killing from the beginning. In its opening argument, the State outlined the events surrounding the Hillis and Beeler murders, and then explained Percy's delayed decision to come forward to tell police what he knew about Thompson's involvement. This discussion of the Crandall murder followed:

[W]hen [Percy] came forward to the Police he insisted that he needed to tell them about something that happened in New Castle, Indiana.... In February of 1991, [Thompson and Percy] went to New Castle, Indiana, to meet a man by the name of Wesley Crandall. Wesley Crandall was a small time marihuana dealer; they went there in a pick-up truck, and Jerry Thompson took his shotgun along. They met Mr. Crandall in his home in New Castle; they conducted their business, and when it came time to leave, they didn't leave. Instead what happened, was Jerry Thompson took his shotgun and he blew part of Wesley Crandall's head off, and killed him. And, he took Wesley Crandall's money that was there, and the marihuana. And, he took Wesley Crandall's guns.... Mr. Thompson was ultimately convicted of the murder of Wesley Crandall in February of 1991.

The jury therefore knew from the outset that Thompson had been a killer and a thief in the past. The prosecutor referred not only to Percy's allegations, but also to their validation in the form of Thompson's murder conviction. The State did not refer at this stage, however, to the point for which evidence of the Crandall murder was originally held to be admissible—to show that Thompson had access to the murder weapon before the crimes.

At oral argument in this Court, the State contended that these details, which were partially corroborated by other witnesses as explained below, were admissible to show Percy's credibility. There is no doubt that Percy's credibility was critical to the State's case. As the defense's opening statement put it:

Who does [the State] say was with Mr. Thompson in New Castle? Douglas Percy. Who does [the State] say was with Jerry Thompson on March 14th of 1991, at Hillis Auto Sales? Douglas Percy. And, who does [the State] say was in Illinois in June

of 1991, when [Thompson] was stopped by [Illinois police]? Douglas Percy.

The defense asked jurors to "think about what somebody's got to gain when they testify. Far more importantly what somebody has to lose. What does Mr. Percy have to lose? ... Pay particular attention to Mr. Percy.... [W]hen you retire to that Jury Room after evaluating the credibility of Mr. Percy, listening to all the Evidence, you're going to have doubts."

### C. *The State's case in chief*

When Percy began to testify about the events surrounding the Crandall murder, the defense objected and renewed its contention that this evidence was irrelevant and inadmissible under Rule 404(b). Observing that Thompson had challenged Percy's credibility in opening arguments, the State maintained that some detail was needed to give the jury "sufficient context" in which to understand, and therefore credit, Percy's testimony about how Thompson acquired the gun used to kill Hillis and Beeler. The defense responded that the State was limited by Rule 404(b) to the "least prejudicial" way of proving access to the murder weapon and that Thompson could not be retried for the Crandall murder. The trial court ruled that the State would be allowed "to simply explain presence and then cut it off and let's get on."

Percy gave the following account. On February 14, 1991, he and Thompson went to Crandall's house to buy marijuana. Percy carried Thompson's sawed-off shotgun into the residence. As Percy waited nearby in the living room, Thompson and Crandall spoke in the kitchen. On a prearranged signal, Percy gave the gun to Thompson, who knocked Crandall down and stated that he thought he had broken Crandall's neck. Thompson pointed the gun at Crandall, but it made a "clicking sound" and would not fire. Thompson retrieved a pillow from another room, placed it over Crandall's head, and fired. Percy testified that Thompson "shot" Crandall. Percy did not see the location of the shot, but assumed that Thompson had shot Crandall in the head. Thompson and Percy each grabbed a large trash bag and drove back to Indianapolis. The bag Thompson carried contained several guns and Percy's bag contained marijuana and shell casings. In the next few weeks, Thompson used Percy's garage to grind the serial numbers off the weapons taken from Crandall's residence. When shown the handgun allegedly used to kill Hillis and Beeler, Percy testified that it "looks like the 'one' [Thompson] always carried," and that it resembled "one of the guns" that was taken from Crandall's house. The serial numbers on the handgun were ground off. In April 1991, Thompson destroyed all the guns taken from Crandall except the handgun, a second gun also admitted in evidence, and a ".22 derringer" that was sold to a third party. Thompson and Percy had the first two guns with them when they were detained by Illinois police in June 1991.[7]

On cross-examination, the defense did not directly challenge Percy's account of what happened in New Castle. Rather, the defense elicited from Percy that he had not been charged with any crime related to those events and that his charge for altering a vehicle identification number was dismissed in exchange for his cooperation in this case. Although Percy's account of the Crandall murder in its particulars was uncontradicted and largely unchallenged, the State offered further detailed evidence about those events.

---

**7.** Thompson argues that the trial court erred in admitting the testimony of Columbus, Indiana gun dealer Velma Brown. She testified that in December 1990 she sold Crandall a handgun similar to the alleged murder weapon in this case. Thompson's contention is meritless. Because the State was properly allowed to show that Thompson stole the murder weapon from Crandall, whether Crandall actually had a gun similar to that weapon at the time he was killed was also relevant. Thompson also challenges the testimony of New Castle gun dealer Jeff Vaughn, who testified that in October 1990 he sold Crandall a gun resembling the second gun discussed above. Vaughn's testimony was irrelevant because the second gun was not alleged to have been used to commit the murders in this case, but Thompson does not explain how Vaughn's testimony prejudiced him. Because the effect of this testimony on the jury was at best speculative, and likely negligible in light of the more inflammatory evidence presented related to Crandall's murder, we see no basis for reversal on this point. Ind.Evidence Rule 103(a) (reversible error not established unless a substantial right of the party is affected).

A forensic pathologist who testified as to the causes of death of Hillis and Beeler was coincidentally the same doctor who performed Wesley Crandall's autopsy. After testifying as to the Indianapolis victims, he also testified that Crandall had died of a gunshot wound to the head. A friend of Percy's, Mike Featheringill, testified that Percy told him that "[Percy] went over to this drug dealer's house, and they were going to purchase some marihuana, and ... Jerry shot the drug dealer with a shotgun, execution style." [8] These witnesses actually added to Percy's account, rather than merely corroborating it, because Percy testified only that he assumed Thompson had shot Crandall in the head. Percy did not assert his knowledge of that fact or whether Crandall died from the shot.

Next, an evidentiary dispute arose over whether the court's pretrial ruling on Thompson's motion in limine, allowing the State to introduce "evidence of the obtaining of the weapon," permitted the State to introduce the fact of Thompson's conviction for the Crandall murder. In a hearing outside the presence of the jury, the State asserted that proof of the conviction was relevant to show identity and because Percy's credibility had been attacked. The State maintained that it understood the pretrial ruling on Rule 404(b) to allow evidence of the conviction itself, and that it relied on this interpretation in referring to the conviction in opening arguments. The defense responded that the conviction was: (1) "impermissible bolstering" of Percy; (2) irrelevant to proving what happened at Hillis Auto Sales on the day of the murders; and (3) too prejudicial to be outweighed by any probative value. The defense argued that the court's pretrial ruling permitted evidence that the gun allegedly used to kill Hillis and Beeler had been taken

from Crandall when he was killed, and nothing more. Without explanation, the trial court ruled that the conviction was admissible. Accordingly, over Thompson's objection, an officer with the New Castle Police Department was allowed to testify that he attended Thompson's trial in Henry County for Crandall's murder, thirty to forty witnesses were called (including Percy), and that the jury convicted Thompson. The charging information, witness list, and verdict form from Henry County were admitted into evidence at that point.

### D. Closing arguments

The State lauded Percy in its closing argument as the man who helped solve both the Indianapolis killings at issue here and Crandall's murder a month earlier:

[I]n the process of telling the Police Department and other Law Enforcement authorities those things that he knew, [Percy] solved 3 murders. On February 14th, 1991, Wesley Crandall, Junior, was murdered in his home in New Castle. Sometime after that 2 retarded men were coerced into admitting that they killed Wesley Crandall, were convicted; they went to prison, and but, for Doug Percy coming forward, they would probably still be there.

Although the State conceded that Percy had some culpability in both crimes, Percy's role was distinguished from Thompson's:

All of us know Doug Percy is not blameless in this, and at the very least, he assisted Jerry Thompson, after these horrible murders were committed.... [T]he Evidence shows that [Percy] did nothing to kill either of those 3 men. He did not break 5'10, 130 pound Wesley Crandall's neck. He didn't stomp on him; he didn't take a shotgun and nearly blow his head off.

**8.** When Featheringill was asked about the events in New Castle, the defense objected on hearsay grounds. The State responded that his testimony was admissible under Evidence Rule 801(d)(1)(B) as a prior consistent statement to rebut Thompson's recent charge of improper motive. Without stating the basis for its ruling, the trial court allowed Featheringill's testimony. To be admissible under this Rule, Percy's motive to fabricate had to have arisen after the prior statement was made. Arguably this prerequisite is not satisfied here. Percy's motive to implicate Thompson arose instantaneously because Percy essentially admitted to an accomplice role in the murders; Percy had every reason to shift culpability to Thompson while minimizing his own involvement. In any event, as explained in Part III *infra*, Featheringill's testimony was not relevant to the material fact of Thompson's access to the murder weapon and therefore should not have been admitted.

The State's closing argument was replete with references to the Crandall murder, to the extent that an uninformed reader would assume that Thompson was being tried for the Crandall murder in this case. Despite the fact that Percy's description of Crandall's killing was largely uncontradicted and unchallenged, the State pointed to the testimony of several witnesses—the gun dealer who sold Crandall the murder weapon that Thompson eventually stole, the forensic pathologist who concluded that Crandall died of a gunshot wound to the head—to corroborate Percy's account.

The defense closed by cautioning the jury that "the State wants to try and 'bootstrap' the events of February 14th, 1991, into scaring you into convicting Jerry Thompson for the events of March 14th." Pointing to Percy's own testimony that he was not always truthful, the defense urged that Percy was a "liar" who implicated Thompson to avoid prosecution for altering a vehicle identification number and possible culpability for his role in the three killings. Counsel contended that the evidence was entirely consistent with Percy's having committed the murders and that his testimony "has been bought and paid for, a number of ways and as such is suspect."

In rebuttal, the State replied that the events surrounding the Crandall murder were relevant:

> The reason it's relevant is because it proves [Thompson's] identity. This [is] the gun that came from there. That's what identifies him with being associated with that gun. Is proof of that conviction in New Castle, proof of his guilt in this case? In and of itself, no. But, the acts that [Thompson] committed up there, as they related to his case are proof of his guilt here; that's the whole reason you were able to hear it.

The State then suggested that because the jury in the Crandall murder trial had apparently credited Percy's testimony, the same should be done here: "[Percy] was scrutinized in New Castle and in Henry County, by that Jury; and they returned a conviction . . . for the killing of the man from whom this gun was taken." The State again argued

that Percy's decision to come forward led to Thompson's conviction for Crandall's murder and the release from jail of two men who had initially pleaded guilty to that crime. In closing, the State described the undoing of the apparently wrongful conviction of the two men as the beginning of a "circle of justice" that could be closed if the jury returned with a conviction in this case.

### III. Application of the Indiana Rules of Evidence

 The well established rationale behind Evidence Rule 404(b) is that the jury is precluded from making the "forbidden inference" that the defendant had a criminal propensity and therefore engaged in the charged conduct. *Hardin v. State*, 611 N.E.2d 123, 129 (Ind.1993). The list of "other purposes" in the Rule is not exhaustive; extrinsic act evidence may be admitted for any purpose not specified in Rule 404(b) unless precluded by the first sentence of Rule 404(b) or any other Rule. *Id.; see generally* ROBERT L. MILLER JR., COURTROOM HANDBOOK ON INDIANA EVIDENCE 61 (1998 ed.). Access to the murder weapon, particularly where the evidence is circumstantial as in this case, is such a permissible purpose. That is not the end of the analysis, however.

 When the defendant objects on the ground that the admission of particular evidence would violate Rule 404(b), the following test should be applied: (1) the court must determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. *See, e.g., Heavrin v. State*, 675 N.E.2d 1075, 1083 (Ind.1996). These criteria mirror Evidence Rules 401, 402, 403, and 404(b). The relevance and balancing issues are reviewed for an abuse of discretion. *Id.*

#### A. *The details of the prior murder were irrelevant*

 Because the State alleged that Thompson stole the murder weapon from Crandall and subsequently used it to kill

Hillis and Beeler, the theft of the gun was relevant to this trial. Thompson's access to the gun was an important piece of circumstantial proof increasing the likelihood that he was the killer (or at least not excluding that possibility). Although Thompson conceded that he was a passenger in the car in which the murder weapon was found three months after the killings, Thompson never offered to stipulate that he had access to the murder weapon before the crimes, or to the specific fact that he stole the weapon from Crandall in February 1991. Rather, he chose to attack Percy's credibility. As a result, the decision to admit evidence of Thompson's access to the gun, and the State's offer of corroborative evidence to support Percy's version of the events in New Castle, was within the trial court's discretion. *See, e.g., Watson v. State,* 540 N.E.2d 598 (Ind.1989) (testimony concerning prior robbery was admissible in murder trial because the defendant had stolen the same type of pistol used to kill the victim); *United States v. Day,* 591 F.2d 861 (D.C.Cir.1978) (evidence of prior robbery was properly allowed where the murder weapon was taken during the robbery and was later found in the house where the defendant was arrested).[9] The issue, however, is whether that discretion was abused in the quantity and quality of the evidence admitted to corroborate Percy's testimony on this collateral point.

Percy did not testify that Crandall was killed in his presence, only that he assumed Thompson shot him in the head. The fact of a shotgun wound could perhaps have been established by a police officer or otherwise without getting into whether it was fatal. Whether it was necessary to show that Thompson shot Crandall is a closer question, but we need not decide that point because the other material admitted clearly went beyond the pale and requires reversal. Two witnesses—the forensic pathologist and Per-

cy's friend Mike Featheringill—testified to how Crandall died. The pathologist opined that Crandall died from a gunshot wound to the head. Inexplicably, Featheringill was also permitted to relate Percy's account of an "execution style" shooting.[10] The fact that Crandall was killed, and how that occurred, was potentially as prejudicial as any fact can be and had no bearing on whether Thompson stole the murder weapon from Crandall that day. Most seriously, the information, witness list, and verdict form from the Crandall murder trial were admitted into evidence. The fact of Thompson's conviction for murdering Crandall was wholly irrelevant to establishing his access to the murder weapon. *See, e.g., United States v. Currier,* 821 F.2d 52 (1st Cir.1987) (in prosecution for unlawful gun possession, recorded conversation between a police informant and the defendant about sale of the gun was properly admitted, but it was error to admit subsequent exchange on the same tape concerning unrelated drug sale).

■ The State's contention that the extra details of the Crandall murder helped prove identity is unpersuasive. The identity exception to the general prohibition on propensity evidence is crafted primarily for "signature" crimes with a common modus operandi. The exception's rationale is that the crimes, or means used to commit them, were so similar and unique that it is highly probable that the same person committed all of them. *Lockhart v. State,* 609 N.E.2d 1093, 1097 (Ind. 1993). The only similarity here between the Crandall murder and the Indianapolis killings was the use of firearms to kill the victims (and different guns were used in each crime). Indeed, the State does not contend that these were signature crimes. Citing several cases, the State nonetheless urges a more expansive view of the identity exception to include evidence of prior crimes in which

---

**9.** As the Eighth Circuit put it in rejecting a Federal Evidence Rule 404(b) challenge: "A jury is entitled to know the circumstances and background of a criminal charge. It cannot be expected to make its decision in a void...." *United States v. Moore,* 735 F.2d 289, 292 (8th Cir. 1984). *See also Swanson v. State,* 666 N.E.2d 397 (Ind.1996) (although common-law doctrine of "res gestae" did not survive enactment of

Indiana Rules of Evidence, facts that are part of the story of the crime are admissible if relevant within the meaning of Evidence Rule 401).

**10.** As discussed in footnote 8 *supra,* this is a prior consistent statement. There is nothing in the record indicating on what basis it was admitted into evidence over Thompson's objection.

an instrumentality used in the current crime was acquired. These authorities, *e.g.*, *Maldonado v. State*, 265 Ind. 492, 355 N.E.2d 843 (1976), however, stand for nothing more than what we have already concluded was permissible—a showing, with reasonable factual context, of access to the murder weapon. They are far from justifying irrelevant and highly prejudicial evidence that has no relation to that point or to any other material fact in dispute.

The State's fallback position, advanced at oral argument in this Court, is that all evidence related to the Crandall murder was properly admitted because Percy's credibility was under attack. Although corroboration of collateral facts is sometimes permissible to show credibility, *see, e.g.,* Ind.Evidence Rule 801(d)(1)(B), corroborative proof is limited by several considerations: (1) whether the challenged witness actually testified to what is sought to be corroborated; (2) whether the corroboration helps prove a material fact (relevance); and (3) whether the corroborative evidence, assuming it is relevant, is nonetheless so prejudicial that it must be excluded under Evidence Rule 403. *United States v. Burke*, 948 F.2d 23 (1st Cir.1991) ("bootstrapping" testimony related to extrinsic acts is admissible but only to the extent it is relevant to a material fact). Indeed, our decisions have cautioned that evidence of prior misconduct offered to bolster a key witness's testimony as to the current charge, although often probative on that point, is also quite prejudicial. *Lannan v. State*, 600 N.E.2d 1334 (Ind.1992).

The allegedly corroborative evidence here was irrelevant. The fact that Crandall died and the fact that Thompson was convicted of his murder did not bear on any aspect of Percy's credibility because Percy did not testify to either subject. The prosecutor's contention at trial that the Crandall jury verdict constituted validation of Percy is a stretch no court can make. It is valid as a logical proposition only if one has an understanding of all the dynamics of the Crandall trial. Conviction there could have been based on forensic or other evidence wholly independent of Percy's testimony. In any event, the jury in this case did not and could not know all of the record in the Crandall trial. Without that knowledge it is impossible to conclude what, if any, "validation" of Percy the conviction represents.

### B. *Rule 403 required exclusion*

More importantly, evidence of a prior conviction is as prejudicial as evidence can get, and requires a strong showing of probative value. The proffered conviction here does not approach the probative value required to outweigh that prejudice under Rule 403. Our cases have long admonished that "one crime cannot be proved in order to establish another distinct crime even though they be of the same kind. Such evidence is highly prejudicial." *Loveless v. State*, 240 Ind. 534, 539, 166 N.E.2d 864, 866 (1960) (in prosecution for burglary, erroneous admission of defendant's alleged involvement in prior burglaries required new trial). Indeed, the prohibition on use of prior misconduct to prove a criminal charge is "a basic tenet of criminal evidence law older than the republic itself." *Lannan*, 600 N.E.2d at 1338. There is no shortage of decisions reversing convictions due to the erroneous admission of the defendant's prior criminal history, specifically prior convictions. *See, e.g., Swain v. State*, 647 N.E.2d 23 (Ind.Ct.App.1995) (evidence as to defendant's four prior convictions for dealing in cocaine should not have been admitted in prosecution for cocaine possession), *trans. denied*; *Pirnat v. State*, 612 N.E.2d 153, 155 (Ind.Ct.App.1993) (in prosecution for child molesting, "[t]estimony regarding the previous [child molesting] conviction and details of the previous molestation were obviously highly prejudicial") (citation and footnote omitted); *United States v. Cox*, 536 F.2d 65, 72 (5th Cir.1976) (admission of a "rap sheet" detailing the defendant's criminal record, including prior convictions, was reversible error). Even oblique or apparently innocuous references to prior convictions are impermissible. *Fox v. State*, 497 N.E.2d 221, 224 (Ind.1986).

If the fact of conviction for a prior murder is presumptively prejudicial, the gruesome details of that offense may be even more damaging. The rules of evidence require courts to guard against exploitation

of those details. Accordingly, even where the defendant's involvement in a prior murder is relevant in part, the circumstances of the killing should not be presented unless they too are relevant. Unnecessary and inflammatory detail may require reversal. For example, in *United States v. Ostrowsky*, 501 F.2d 318 (7th Cir.1974), the defendants were charged with concealing a stolen car and moving it in interstate commerce. One of the defendants had killed the possessor of the car (who apparently had stolen the vehicle himself) before the car was driven from Indiana to Illinois. The Seventh Circuit held that the fact that the possessor had been killed was admissible to prove his lack of consent to the transfer of possession and, therefore, that the car had been stolen from him. However, the details of the killing, including the cause of death "as being two gunshot wounds in the head," *id.* at 321, were unfairly prejudicial and required a new trial. If the extraneous details of the killing were inadmissible in *Ostrowsky*—a case involving car theft—the prejudice to Thompson in a second murder prosecution is an *a fortiori* case. *Cf. United States v. York*, 933 F.2d 1343, 1353–54 (7th Cir.1991) (distinguishing *Ostrowsky* and lauding trial court's "sanitized and tightly controlled" admission of evidence of prior murder and "vigilant efforts to minimize its prejudicial impact").

Even if all the evidence related to the Crandall murder and Thompson's trial in Henry County were relevant and of probative value here, this evidence would not clear the balancing hurdle of Evidence Rule 403. We have little difficulty concluding that the fact and manner of Crandall's death, and Thompson's murder conviction, were highly prejudicial to Thompson. Because the risk that the jury would draw the "forbidden inference" based on what happened in Henry County is undeniable, the probative value of the extra details of the Crandall murder was substantially outweighed by the danger of unfair prejudice. Indeed, by the time of closing argument, the State referred to the discrete killings as a "circle" of criminal conduct for which Thompson should be held responsible. The State all but urged the jury to make the forbidden inference. Despite Thompson's actions linking the separate

events, the jury was impermissibly left with the "reverberating clang" of the Crandall murder ringing in its ears, *United States v. Merriweather*, 78 F.3d 1070, 1077 (6th Cir. 1996) (reversing conviction due to erroneous admission of propensity evidence) (internal quotation marks omitted), suggesting that because Thompson killed and robbed Crandall, he must have killed and robbed Hillis and Beeler too.

■ If there is one lesson to take from this case, it is that Thompson's questioning Percy's credibility did not open a door through which all evidence related to the Crandall murder could automatically pass. In its effort to prove guilt, the State may not "flood the courtroom" with unnecessary and prejudicial details of prior criminal conduct merely because some of that evidence is relevant and admissible. *United States v. Smith*, 80 F.3d 1188, 1193 (7th Cir.1996) (internal quotation marks omitted). Rule 404(b) is on the books because evidence of prior crimes is presumptively prejudicial. Even where a prior criminal act is relevant to a material fact, the potential for unfair prejudice dictates that the evidence of the prior misconduct be limited to that necessary to prove the disputed fact. When this mandate is observed, the conviction will not be disturbed. *See, e.g., Taylor v. State*, 659 N.E.2d 535, 542–43 (Ind.1995). The propensity evidence in this case crossed that line by a wide margin. If Percy's testimony about Thompson's taking the murder weapon from Crandall was the permissible "core" evidence showing Thompson's access to the gun, the other details—an "execution style" shooting, Thompson's conviction for the Crandall murder—were a penumbra of dubious relevance and potentially inflammatory impact. In the end, an impermissible flood of damaging propensity evidence washed away Thompson's right to a fair trial.

## C. *The errors were not harmless*

■ We cannot conclude that these evidentiary errors were harmless. Percy's credibility was critical to the State's case. His testimony was an essential element in the chain of evidence pointing to Thompson as the killer. It also placed Percy himself at

each of these crime scenes. The jury's verdict reflects a decision to credit Percy's testimony that this Court, as an appellate tribunal, would ordinarily not question. However, the jury's apparent decision to believe Percy may have turned on the wrongly admitted evidence. Moreover, the State emphasized the prior misconduct in its opening statement, during the case in chief, and again in its closing argument. Under these circumstances, the errors were not harmless.[11] *See Wickizer v. State*, 626 N.E.2d 795, 800–01 (Ind.1993) (holding that improperly admitted evidence of prior acts was not harmless error where the State emphasized the disputed conduct in its opening and closing arguments); *James v. State*, 622 N.E.2d 1303, 1309–10 (Ind.Ct.App.1993) (erroneous admission of propensity evidence was not harmless due to prosecutor's "steady drumbeat" of references to the defendant's prior criminal record, especially in closing arguments). *Cf. Bowen v. State*, 680 N.E.2d 536, 540 (Ind. 1997) (improper comments about defendant's criminal background did not require reversal because evidence independently supported conviction for burglary); *United States v. Burke*, 948 F.2d 23, 28 (1st Cir.1991) (erroneous admission of extrinsic acts was harmless because there was strong properly admitted evidence of guilt and prosecutor did not "embellish upon the incident"). The convictions must be reversed because a "fair trial is required for every defendant, regardless of his apparent guilt or the magnitude of the crimes he may have committed." *Ostrowsky*, 501 F.2d at 324. In light of this disposition, it is unnecessary to reach the remaining claims of error.[12]

## IV. Double Jeopardy

 Because reversal in this case is due to trial error in the admission of evidence, the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, applicable to the states through the Due Process Clause of the Fourteenth Amendment,[13] generally does not bar a retrial on the same crimes. *Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988). However, double jeopardy forbids a retrial—even where the defendant requests it as here—if the reviewing court concludes that the evidence is legally insufficient to support the conviction. *Champlain v. State*, 681 N.E.2d 696, 702 (Ind.1997). Evidence is sufficient if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Wooden v. State*, 657 N.E.2d 109, 111 (Ind.1995). In this review, we do not reweigh evidence or assess the credibility of witnesses. *Id.* If Percy's account is credited, he was essentially an accomplice or, at a minimum, a direct observer of Thompson's criminal acts. Indeed, the jury could have convicted Thompson on Percy's testimony alone. Because a "conviction in a capital case may be based upon the uncorroborated testimony of an accomplice," *Lowery v. State*, 547 N.E.2d 1046, 1053 (Ind.1989) (citation omitted), the Double Jeopardy Clause does not preclude a retrial.

## Conclusion

The convictions and sentence are reversed. This cause is remanded for a new trial.

---

11. It was noted at oral argument in this Court that due to the erroneous (but unobjected) reading of the death penalty information in voir dire, the jury was advised from the outset of Thompson's conviction of Crandall's murder. *See* Part I *supra*. It could be argued that the evidentiary errors during the guilt phase were therefore harmless. First, this does not remove the stain of admitting the conviction into evidence in view of the instruction that the jury is to consider only evidence in reaching its verdict, and not the charging information. Second, although we find no directly relevant precedent, we are not willing to bootstrap failure to object to one major error into harmlessness of others in a death penalty case.

12. The State's claim that any prejudice to Thompson was cured by a limiting instruction is unpersuasive. Rather than telling the jury to disregard the disputed evidence completely because it was not admissible for any purpose, the limiting instruction here instructed the jury to limit its consideration of prior acts to identity. As noted, the extraneous Crandall murder evidence was not admissible for this purpose.

13. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

DICKSON, SULLIVAN and SELBY, JJ., concur.

SHEPARD, C.J., concurs with separate opinion.

SHEPARD, Chief Justice, concurring.

I join fully in the majority opinion, but write separately to make an observation pertinent to the second trial. While we have reversed on the basis of evidence improperly admitted during the State's case in chief, it might turn out that discrete pieces of this evidence would be admissible as rebuttal. What particular parts of this mass might be fair rebuttal will, of course, depend on how the two parties elect to shape the presentation of their principal cases.